## AFFIDAVIT OF SPECIAL AGENT WILBERT C. MOY
## IN SUPPORT OF A SEARCH WARRANT

I, WILBERT C. MOY, being duly sworn, depose and state:

1. I am a Special Agent of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), currently assigned to the Office of the Special Agent in Charge in Boston, Massachusetts, and have been employed in that capacity since 2001. I have been assigned to the Airport/Seaport Group since 2014, and am responsible for investigating any importation into the United States contrary to law. Prior to my current position, I was assigned to the Document and Benefit Fraud Task Force from 2007 to 2014. From 2001 to 2007, I was assigned to the Cybercrimes Group and investigated child pornography and child exploitation crimes.

2. This affidavit is based upon information supplied to me by other law enforcement officers, my personal involvement in this investigation, and my training and experience. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

3. The property to be searched is a silver iPhone (IMEI number 354450063418247) ("iPhone") and a white Alcatel Onetouch mobile phone (IMEI number 01422200459385) ("Alcatel phone") (collectively, the "Devices").

4. The Devices are currently located in my possession at HSI Boston.

5. The warrant for which I am applying authorizes the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.  On July 31, 2015, MELISSA GUERRERO PENA ("PENA"), DOB xx/xx/1995, arrived at Logan International Airport in Boston, MA, on JetBlue flight #830 from Santo Domingo, Dominican Republic. PENA, a citizen of the United States, presented herself to the primary Customs and Border Protection Officer ("CBPO") for inspection.

7.  The CBPO asked PENA for her passport, and noticed that her hand was visibly shaking. The CBPO noted that her passport was issued on July 24, 2015, and that she had traveled to the Dominican Republic on July 26, 2015. Based on PENA's demeanor, her recent procurement of a passport, and the relatively short length of her stay in the Dominican Republic, the CBPO referred PENA for secondary inspection.

8.  PENA was escorted to the Customs and Border Protection ("CBP") secondary baggage inspection area and was selected for examination by CBPO Michael Carbone. CBPO Carbone emptied her luggage, and noticed that the empty suitcase was heavier than he expected. PENA's suitcase was x-rayed, and an anomaly was observed in one of the exterior panels of the luggage.

9.  CBPOs probed the portion of the luggage where the anomaly was observed, and a white powdery substance was retrieved. The substance was field tested, and tested positive for cocaine. The luggage panel was disassembled, revealing one brick that appeared to contain a white powdery substance, wrapped in plastic, and then wrapped in a substance that appeared to be Kevlar tape and sewed into the interior of the luggage. The brick was removed from the luggage and placed on a scale. The total gross weight of the brick was determined to be 2,555 grams (2.555 kilograms).

10. At approximately 10:50 a.m. I encountered PENA and asked her if she spoke English. She replied that English was her first language, and that she also speaks Spanish. I then provided PENA with her Miranda warnings in English. PENA stated that she understood the warnings, signed a waiver of her rights, and agreed to speak with me without counsel present.

11. PENA stated that she has a family friend who asked her to travel to the Dominican Republic and return with something in her luggage. PENA said that her friend said that it would be easy, and that she would do it first to show PENA that nothing would happen to her. PENA stated that she agreed to travel to the Dominican Republic after her friend returned without incident.

12. PENA stated that her friend told her that she would be bringing something back that was not drugs, but that it was something that went into drugs. She further mentioned that she did not know if it would be money, or if it was something else. PENA stated that her friend told her that what she would be bringing into the United States would not be illegal, but that nonetheless the airport would have a hard time with it.

13. PENA stated that her friend arranged for her to obtain a United States passport on July 24, 2015, and paid the passport renewal fees. PENA went with her friend to purchase a plane ticket to the Dominican Republic, and her friend paid for the ticket in cash.

14. PENA indicated that she communicated with her friend about her travel to the Dominican Republic and her application for a passport using the iPhone. PENA also stated that she sent her friend a photograph of herself using the iPhone so that other individuals in the Dominican Republic would be familiar with her appearance when she arrived.

15. PENA said that she traveled to the Dominican Republic on July 26, 2015. Upon arrival, PENA was picked up by an individual whom she did not previously know, and was

driven to her grandmother's house. This individual gave PENA the Alcatel Phone, and told her to call him if she needed anything while she was in the Dominican Republic.

16. On July 31, 2015, she was picked up by the same individual. She stated that on the way to the airport, they stopped, and the luggage was emptied of its contents and the contents were placed into another bag. A taxi was then called for her, and drove her to the airport with the new bag.

17. PENA stated that she was instructed to meet someone at Logan Airport upon arrival in Boston, who would take her to her friend's home in Dorchester, where she would leave the bag.

18. The Devices were in PENA's possession when she was referred for secondary examination. The Devices are currently in the lawful possession of HSI, which seized the Devices incident to PENA's arrest. Therefore, while HSI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

19. The Devices are currently in storage at HSI Boston. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of HSI.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

  c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and

are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

21. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device, with whom the devices were used to communicate, and the content of certain electronic communications.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire media, that might expose many parts of the Devices to human inspection in order to determine whether they are evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Sworn to under the pains and penalties of perjury,

WILBERT MOY
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Sworn and subscribed before me this 10th day of August 2015.

DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

The property to be searched is a silver iPhone (IMEI number 354450063418247) ("iPhone") and a white Alcatel Onetouch mobile phone (IMEI number 01422200459385) ("Alcatel phone") (collectively, the "Devices").

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 525 and involve Melissa Guerrero Pena since June 1, 2015, including:

   a. any information or communications related to drug smuggling, including but not limited to sources of drugs (including names, addresses, phone numbers, or any other identifying information), dates, places, and amounts of specific occurrences of drug smuggling, and contact information for individuals involved in drug smuggling;

   b. any information or communications with other individuals regarding Melissa Guerrero Pena's travel to or stay in the Dominican Republic from July 24, 2015 to July 31, 2015;

   c. any information or communications with other individuals regarding Melissa Guerrero Pena's application for a United States passport in July 2015; and

   d. any information or communications regarding Melissa Guerrero Pena's schedule or travel from June 1, 2015 to the present.

2. Evidence of user attribution showing who used or owned or used the Devices at the time the data described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and internet browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.